Window World of Baton Rouge, LLC v. Window World, Inc.; Window World of St. Louis, Inc. v. Window World, Inc., 2019 NCBC 10.

STATE OF NORTH CAROLINA

WILKES COUNTY

WINDOW WORLD OF BATON
ROUGE, LLC; WINDOW WORLD OF
DALLAS, LLC; WINDOW WORLD
OF TRI STATE AREA, LLC; and
JAMES W. ROLAND,

              Plaintiffs,

    v.

WINDOW WORLD, INC.; WINDOW
WORLD INTERNATIONAL, LLC;
and TAMMY WHITWORTH,

              Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
15 CVS 1

**ORDER AND OPINION ON
DEFENDANT WINDOW WORLD
INTERNATIONAL, LLC'S MOTION
FOR JUDGMENT ON THE
PLEADINGS**

WILKES COUNTY

15 CVS 2

WINDOW WORLD OF ST. LOUIS,
INC.; WINDOW WORLD OF
KANSAS CITY, INC.; WINDOW
WORLD OF SPRINGFIELD/PEORIA,
INC.; JAMES T. LOMAX III;
JONATHAN GILLETTE; B&E
INVESTORS, INC.; WINDOW
WORLD OF NORTH ATLANTA,
INC.; WINDOW WORLD OF
CENTRAL ALABAMA, INC.;
MICHAEL EDWARDS; MELISSA
EDWARDS; WINDOW WORLD OF
CENTRAL PA, LLC; ANGELL P.
WESNERFORD; KENNETH R.
FORD, JR.; WORLD OF WINDOWS
OF DENVER, LLC; RICK D. ROSE;
CHRISTINA M. ROSE; WINDOW
WORLD OF ROCKFORD, INC.;
WINDOW WORLD OF JOLIET, INC.;
SCOTT A. WILLIAMSON;
JENNIFER L. WILLIAMSON; BRIAN
C. HOPKINS; WINDOW WORLD OF
LEXINGTON, INC.; TOMMY R.
JONES; JEREMY T. SHUMATE;

WINDOW WORLD OF PHOENIX
LLC; JAMES BALLARD; and TONI
BALLARD,

     Plaintiffs,

v.

WINDOW WORLD, INC.; WINDOW
WORLD INTERNATIONAL, LLC;
and TAMMY WHITWORTH,
individually and as trustee of the
Tammy E. Whitworth Revocable
Trust,

     Defendants.

1.  **THIS MATTER** is before the Court on Defendant Window World International, LLC's ("WWI") Motion for Judgment on the Pleadings (the "Motion") in the above-captioned cases.[1] After reviewing the Motion, the briefs in support of and in opposition to the Motion, the relevant materials associated with the Motion, and the arguments of counsel at the hearing on the Motion, the Court hereby **GRANTS in part** and **DENIES in part** the Motion.

> *Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, by Charles E. Coble, Robert J. King III, Benjamin R. Norman, Jeffrey E. Oleynik, and Andrew L. Rodenbough, and Keogh Cox & Wilson, Ltd., by Richard W. Wolff, John P. Wolff, III, and Virginia J. McLin, for Plaintiffs Window World of Baton Rouge, LLC, Window World of Dallas, LLC, Window World of Tri State Area LLC, James W. Roland, Window World of St. Louis, Inc., Window World of Kansas City, Inc., Window World of Springfield/Peoria, Inc., James T. Lomax III, Jonathan Gillette, B&E Investors, Inc., Window World of North Atlanta, Inc., Window World of Central Alabama, Inc., Michael Edwards, Melissa Edwards, Window World of Central PA, LLC, Angell P. Wesnerford, Kenneth R. Ford, Jr., World of Windows of Denver, LLC, Rick D. Rose, Christina M. Rose, Window World of Rockford, Inc., Window World of Joliet, Inc., Scott A.*

---

[1] For ease of reference, the Court will refer to *Window World of Baton Rouge, LLC v. Window World, Inc.* (15 CVS 1) as the "Baton Rouge Action" and *Window World of St. Louis, Inc. v. Window World, Inc.* (15 CVS 2) as the "St. Louis Action" (collectively, the "Actions").

*Williamson, Jennifer L. Williamson, Brian C. Hopkins, Window World of Lexington, Inc., Tommy R. Jones, Jeremy T. Shumate, Window World of Phoenix LLC, James Ballard, and Toni Ballard.*

*Manning, Fulton & Skinner, P.A., by Michael T. Medford, Judson A. Welborn, Natalie M. Rice, and Jessica B. Vickers, and Laffey, Leitner & Goode LLC, by Mark M. Leitner, Joseph S. Goode, Jessica L. Farley, Sarah E. Thomas Pagels, and John W. Halpin, for Defendants Window World, Inc. and Window World International, LLC.*

*Bell, Davis & Pitt, P.A., by Andrew A. Freeman and Alan M. Ruley, for Defendant Tammy Whitworth.*

Bledsoe, Chief Judge.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

2. The Court does not make findings of fact on motions for judgment on the pleadings under North Carolina Rule of Civil Procedure 12(c) and recites only those allegations in the pleadings that are relevant and necessary to the Court's determination of the Motion. *See, e.g., Erickson v. Starling*, 235 N.C. 643, 657, 71 S.E.2d 384, 394 (1952).[2]

---

[2] The pertinent procedural and factual background of these matters is set out more fully in *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2019 NCBC LEXIS 7 (N.C. Super. Ct. Jan. 25, 2018), *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2018 NCBC LEXIS 218 (N.C. Super. Ct. Dec. 19, 2018), *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2018 NCBC LEXIS 101 (N.C. Super. Ct. Sept. 28, 2018), *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2018 NCBC LEXIS 100 (N.C. Super. Ct. Sept. 26, 2018), *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2018 NCBC LEXIS 79 (N.C. Super. Ct. Aug. 2, 2018), *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2018 NCBC LEXIS 59 (N.C. Super. Ct. June 19, 2018), *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2017 NCBC LEXIS 60 (N.C. Super. Ct. July 12, 2017), *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2016 NCBC LEXIS 82 (N.C. Super. Ct. Oct. 25, 2016), and *Window World of St. Louis, Inc. v. Window World, Inc.*, 2015 NCBC LEXIS 79 (N.C. Super. Ct. Aug. 10, 2015). The Court recites in this Order and Opinion only those facts necessary for the determination of the Motion.

3.     Defendant Window World, Inc. ("Window World") is a North Carolina corporation with its principal place of business in Wilkes County, North Carolina. (Pls.' Third Am. Compl. ¶ 15, [hereinafter "Baton Rouge TAC"], ECF No. 252 (15 CVS 1); Pls.' Third Am. Compl. ¶ 50, [hereinafter "St. Louis TAC"], ECF No. 275 (15 CVS 2).) Window World is in the business of franchising its business to franchisees, who purchase materials such as windows, doors, and siding from third-party suppliers at wholesale and install the products under the Window World name. (Baton Rouge TAC ¶ 20; St. Louis TAC ¶ 55.) Window World also licenses the use of Window World trademarks and other Window World intellectual property to its franchisees. (Baton Rouge TAC ¶ 20; St. Louis TAC ¶ 55.)

4.     WWI is a Delaware limited liability company with its principal place of business in Wilkes County, North Carolina. (Baton Rouge TAC ¶ 16; St. Louis TAC ¶ 51.) WWI was organized on June 22, 2010, (Baton Rouge TAC ¶ 289; St. Louis TAC ¶ 394), and is owned solely by Defendant Tammy Whitworth ("Ms. Whitworth"), (Baton Rouge TAC ¶ 199; St. Louis TAC ¶ 298).

5.     Plaintiffs in these actions are various Window World franchisees and franchisee owners. (*See* Baton Rouge TAC ¶¶ 11–14; St. Louis TAC ¶¶ 12–49.) St. Louis Action Plaintiffs James T. Lomax III ("Lomax") and Jonathan Gillette ("Gillette") own Plaintiffs Window World of St. Louis, Inc., Window World of Kansas City, Inc., and Window World of Springfield/Peoria, Inc. (collectively with Lomax and Gillette, the "Lomax Plaintiffs"). (St. Louis TAC ¶ 17.) Baton Rouge Plaintiff James W. Roland ("Roland") owns Plaintiffs Window World of Baton Rouge, LLC, Window

World of Dallas, LLC, and Window World of Tri State Area, LLC (collectively with Roland, the "Roland Plaintiffs" and, together with the Lomax Plaintiffs, the "Lomax and Roland Plaintiffs"). (Baton Rouge TAC ¶¶ 11–14.)

6. On March 22, 2010, Ms. Whitworth became the sole shareholder of Window World after the death of her husband, Todd, and appointed herself Window World's CEO at a time when Window World had no board of directors. (Baton Rouge TAC ¶ 176; St. Louis TAC ¶ 275.) On June 21, 2010, Ms. Whitworth transferred all of her Window World stock to the Tammy E. Whitworth Revocable Trust, an entity solely under her control. (Baton Rouge TAC ¶ 178; St. Louis TAC ¶ 277.)

7. According to Plaintiffs, Ms. Whitworth created WWI on June 22, 2010 to receive Window World's intellectual property in a scheme to defraud Window World's creditors, including Plaintiffs. (Baton Rouge TAC ¶ 289; St. Louis TAC ¶ 394.) In particular, Plaintiffs allege that the "sole purpose for which [Ms. Whitworth] created WWI was as a repository for [Window World's] intellectual property assets . . . in the event of . . . an 'unfriendly suit.'" (Baton Rouge TAC ¶ 200; St. Louis TAC ¶ 299.)[3]

8. On June 23, 2010, the day after WWI was organized, Window World transferred to WWI all of its intellectual property assets (the "2010 Transfer"), including but not limited to the Window World trademarks (the "Transferred Assets"). (Baton Rouge TAC ¶ 289; St. Louis TAC ¶ 394.) WWI paid nothing to Window World in exchange for the Transferred Assets. (Baton Rouge TAC ¶ 201; St.

---

[3] On June 22, 2010, the same day that WWI was organized, Marie Whitworth, the mother of Todd Whitworth, filed a civil action in Wilkes County Superior Court against Window World, the Estate of Todd Whitworth, and Ms. Whitworth, individually and as Executor of the Estate of Todd Whitworth. (Baton Rouge TAC ¶ 291; St. Louis TAC ¶ 396.)

Louis TAC ¶ 300.) Window World later paid WWI a total of $120,000 for a license to continue using the Transferred Assets. (Baton Rouge TAC ¶ 201; St. Louis TAC ¶ 300.)

9.      Sometime in 2010, WWI registered its ownership in some or all of the Transferred Assets with the United States Patent and Trademark Office (the "USPTO").[4]

10.     Sometime prior to April 2011, Plaintiffs allege that Window World's intent to defraud creditors "was confirmed in statements made to [Roland] and to [Lomax] . . . by upper management of [Window World] about the purpose of the [2010 Transfer]." (Baton Rouge TAC ¶ 292; *see* St. Louis TAC ¶ 397.) The Third Amended Complaints contain no allegations suggesting that any of the other Plaintiffs (the "Remaining Plaintiffs")[5]—apart from the Lomax and Roland Plaintiffs—were made aware of the 2010 Transfer before the Actions were filed.

---

[4] In ruling on a motion under Rule 12(c), the Court may properly consider matters of which judicial notice may be taken. *See Wood v. J. P. Stevens & Co.*, 297 N.C. 636, 641, 256 S.E.2d 692, 696 (1979); *see also Zloop, Inc. v. Parker Poe Adams & Bernstein, LLP*, 2018 NCBC LEXIS 16, at *14 (N.C. Super. Ct. Feb. 16, 2018) ("[A] court may properly consider matters of which it may take judicial notice without converting a Rule 12(c) motion to one for summary judgment."). In addition, the Court may take judicial notice of matters available from the USPTO's electronic database. *See* N.C. R. Evid. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); *see also Clear Defense, LLC v. Cleardefense Pest Control of Greensboro, LLC*, No. 1:17-cv-01139, 2018 U.S. Dist. LEXIS 182065, at *1 n.1 (M.D.N.C. Oct. 23, 2018) ("Because all of Defendants' exhibits . . . are public records (primarily, [USPTO] records), the court judicially notices them for the fact that such filings were made.").

[5] For purposes of this Order and Opinion, the "Remaining Plaintiffs" shall include the following persons and entities: B&E Investors, Inc.; Window World of North Atlanta, Inc.; Window World of Central Alabama, Inc.; Michael Edwards; Melissa Edwards; Window World of Central Pa, LLC; Angell P. Wesnerford; Kenneth R. Ford, Jr.; World of Windows of Denver,

11.     On April 23, 2013, the Lomax and Roland Plaintiffs entered into a tolling agreement with Window World (the "Tolling Agreement").  (Baton Rouge TAC ¶ 157; St. Louis TAC ¶ 256; *see* WWI's Br. Supp. Mot. J. Pleadings Ex. A [hereinafter "Tolling Agmt."], ECF No. 365.1 (15 CVS 1), ECF No. 385.1 (15 CVS 2).)[6]  The Tolling Agreement provided that "all time-based defenses, including without limitation any applicable statutes of limitations, statutes of repose, and the doctrine of laches with respect to the Covered Claims[7] are hereby tolled effective April 23, 2013."  (Tolling Agmt. ¶ 2.)  WWI was not a party to the Tolling Agreement, (*see* Tolling Agmt.), and the Remaining Plaintiffs did not enter into a similar agreement with Window World.

12.     Plaintiffs commenced these Actions on January 2, 2015, and filed their Third Amended Complaint in each on January 11, 2017.  (*See* Baton Rouge TAC ¶¶ 222–300; St. Louis TAC ¶¶ 321–405.)  Although Plaintiffs assert numerous claims in each Action, the only claim lodged against WWI is for fraudulent transfer under the North Carolina Uniform Voidable Transactions Act (the "NCUVTA").  (*See* Baton

---

LLC; Rick D. Rose; Christina M. Rose; Window World of Rockford, Inc.; Window World of Joliet, Inc.; Scott A. Williamson; Jennifer L. Williamson; Brian C. Hopkins; Window World of Lexington, Inc.; Tommy R. Jones; Jeremy T. Shumate; Window World of Phoenix LLC; James Ballard; and Toni Ballard.

[6] Although the Tolling Agreement was not attached to either Third Amended Complaint, the agreement was specifically referenced in each, (*see* Baton Rouge TAC ¶ 157; St. Louis TAC ¶ 256), and thus may be considered on the Motion, *see Reese v. City of Charlotte*, 196 N.C. App. 557, 558, 676 S.E.2d 493, 494 (2009) (holding trial court properly considered documents referred to in complaint in deciding Rule 12(c) motion).

[7] The Tolling Agreement defined Covered Claims as "any and all claims, causes of action, or defenses, whether asserted or unasserted, that presently exist between the Franchisees or any Franchisee on the one hand and [Window World] on the other."  (Tolling Agmt. ¶ 1.)  Franchisees were defined to include each of the Lomax and Roland Plaintiffs.  (Tolling Agmt. ¶ 1.)

Rouge TAC ¶¶ 286–300; St. Louis TAC ¶¶ 391–405).[8] Plaintiffs' NCUVTA claims seek to void the 2010 Transfer. (Baton Rouge TAC ¶ 300; St. Louis TAC ¶ 405.)

13. On March 29, 2018, WWI filed the Motion, contending that Plaintiffs' fraudulent transfer claims must be dismissed as a matter of law because they were not filed within the time period prescribed by the applicable statute of repose. (WWI's Mot. J. Pleadings, ECF No. 364 (15 CVS 1), ECF No. 384 (15 CVS 2).)

14. The Court held a hearing on the Motion on May 24, 2018, at which all parties were represented by counsel. The Motion has been fully briefed and heard and is now ripe for determination.

## II.

## LEGAL STANDARD

15. Under Rule 12(c) of the North Carolina Rules of Civil Procedure, "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." N.C. R. Civ. P. 12(c). A motion under Rule 12(c) "is the proper procedure when all the material allegations of fact are admitted in the pleadings and only questions of law remain." *Ragsdale v. Kennedy*, 286 N.C. 130, 137, 209 S.E.2d 494, 499 (1974). The Court must "view the facts and permissible

---

[8] Plaintiffs also seek to "recover from Tammy Whitworth individually and from WWI on each of the causes of action Plaintiffs assert against [Window World] pursuant to the doctrines of piercing the corporate veil, mere instrumentality and/or alter ego." (Baton Rouge TAC ¶ 163; St. Louis TAC ¶ 262; *see* Baton Rouge TAC ¶¶ 172, 197–201; St. Louis TAC ¶¶ 271, 296–302.) WWI did not seek dismissal of this remedy in its Motion and opening brief, and thus, despite WWI's conclusory request—made only in its reply brief—that WWI be dismissed from the Actions, the sufficiency of Plaintiffs' veil-piercing allegations against WWI are not properly a subject of the current Motion. *See* N.C. R. Civ. P. 7(b)(1) (providing that motions "shall be made in writing, shall state with particularity the grounds therefor, and shall set forth the relief or order sought").

inferences in the light most favorable to the nonmoving party," *id*., and may consider "only the pleadings and exhibits which are attached and incorporated into the pleadings[,]" *Davis v. Durham Mental Health/Dev. Disabilities/Substance Abuse Area Auth.*, 165 N.C. App. 100, 104, 598 S.E.2d 237, 240 (2004) (quoting *Helms v. Holland*, 124 N.C. App. 629, 633, 478 S.E.2d 513, 516 (1996)).

16. "All well pleaded factual allegations in the nonmoving party's pleadings are taken as true and all contravening assertions in the movant's pleadings are taken as false." *Ragsdale*, 286 N.C. at 137, 209 S.E.2d at 499. "When the pleadings do not resolve all the factual issues, judgment on the pleadings is generally inappropriate." *Id.* "[W]hen a complaint does not allege 'facts sufficient to state a cause of action or pleads facts which deny the right to any relief[,]'" the Court should grant a Rule 12(c) motion. *Reese v. Brooklyn Vill., LLC*, 209 N.C. App. 636, 641, 707 S.E.2d 249, 253 (2011) (quoting *Robertson v. Boyd*, 88 N.C. App. 437, 440, 363 S.E.2d 672, 675 (1988)).

III.

ANALYSIS

17. WWI's sole contention on the Motion is that Plaintiffs' fraudulent transfer claims are untimely as a matter of law under N.C. Gen. Stat. § 39-23.9.

18. The NCUVTA provides two different methods by which a creditor can void a transfer made by a debtor. *See* N.C. Gen. Stat. § 39-23.4(a). Specifically, section 39-23.4(a) of the NCUVTA provides as follows:

> A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) With intent to hinder, delay, or defraud any creditor of the debtor; or

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

    a. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

    b. Intended to incur, or believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

*Id.* Plaintiffs seek to void Window World's 2010 Transfer to WWI under subsections 39-23.4(a)(1) and (a)(2).

19. Section 39-23.9, the statute of repose for claims under section 39-23.4(a), *see KB Aircraft Acquisition, LLC v. Berry*, 249 N.C. App. 74, 83, 790 S.E.2d 559, 566 (2016), provides that a claim is extinguished unless an action is brought:

(1) Under G.S. 39-23.4(a)(1), not later than four years after the transfer was made or the obligation was incurred or, if later, not later than one year after the transfer or obligation was or could reasonably have been discovered by the claimant; [or]

(2) Under G.S. 39-23.4(a)(2) . . ., not later than four years after the transfer was made or the obligation was incurred[.]

N.C. Gen. Stat. §§ 39-23.9(1)–(2). Thus, claims generally must be asserted within four years of a transfer unless they are brought pursuant to the savings clause applicable to section 39-23.4(a)(1) and within one year after the transfer "was or could reasonably have been discovered by the claimant[.]" *Id.* § 39-23.9(1).

20. The North Carolina Court of Appeals has interpreted "transfer" in section 39-23.9 to refer to "the date that the transfer actually occurred, and not the date that the fraudulent nature of the transfer became apparent." *KB Aircraft Acquisition,*

*LLC*, 249 N.C. App. at 81, 790 S.E.2d at 564. The parties agree that the alleged fraudulent transfer here—the 2010 Transfer—occurred on June 23, 2010. Thus, for purposes of section 39-23.4(a)(2) and the four-year provision applicable to section 39-23.4(a)(1), the statute of repose began to run from that date.

21. It is undisputed that Plaintiffs' NCUVTA claims were filed on January 2, 2015 and thus not within four years after the 2010 Transfer. Nevertheless, Plaintiffs contend that certain NCUVTA claims are timely because (i) Plaintiffs did not discover, nor could they have reasonably discovered, the 2010 Transfer more than one year prior to filing suit in 2015 (i.e., before January 2, 2014), thus satisfying the one-year savings clause in section 39-23.9(1) and thereby permitting the timely assertion of their claims under section 39-23.4(a)(1), and (ii) as to the Lomax and Roland Plaintiffs only, the April 23, 2013 Tolling Agreement tolled operation of section 39-23.9's statute of repose as to their claims under both sections 39-23.4(a)(1) and (a)(2).

22. WWI argues that two separate events provided Plaintiffs with sufficient notice of the 2010 Transfer to trigger the one-year savings clause in section 39-23.9(1) as a matter of law for purposes of their claims under section 39-23.4(a)(1). First, WWI points to allegations in Plaintiffs' Third Amended Complaints indicating that Window World's upper management made statements to Lomax and Roland no later than April 2011 confirming Window World's intent to defraud creditors through the 2010 Transfer. (*See* Baton Rouge TAC ¶ 292; St. Louis TAC ¶ 397.) Second, WWI contends that its filings with the USPTO in 2010 attesting to its ownership of the Transferred

Assets establishes that each Plaintiff reasonably could have discovered the 2010 Transfer at any time after those filings became a matter of public record in 2010.

23. Because the allegations and arguments related to the Lomax and Roland Plaintiffs differ from those related to the Remaining Plaintiffs, the Court will analyze them separately.

A. The Lomax and Roland Plaintiffs

24. The Court turns first to WWI's contention that the Lomax and Roland Plaintiffs' claims under section 39-23.4(a)(1) are barred under the one-year savings clause in section 39-23.9(1)[9] because Plaintiffs allege Lomax and Roland learned of the 2010 Transfer prior to April 2011 but failed to file their claims under section 39-23.4(a)(1) by April 2012. In particular, WWI points to the Third Amended Complaint in each Action, which asserts that Window World's intent to defraud its creditors "was confirmed in statements made to [Roland] and to [Lomax] prior to April 2011 by upper management of [Window World] about the purpose of the June 23, 2010 transfers." (Baton Rouge TAC ¶ 292; *see* St. Louis TAC ¶ 397.)

25. Taking these allegations as true, as it must, the Court concludes that the Lomax and Roland Plaintiffs have satisfactorily pleaded that Lomax and Roland each "discovered" the 2010 Transfer no later than April 2011. As Plaintiffs appear to concede, Lomax's and Roland's discoveries are imputed to the remaining Lomax and Roland Plaintiffs as a matter of law. (*See* Pls.' Br. Opp'n Mot. J. Pleadings 10 n.4,

---

[9] It is worth emphasizing that the one-year savings clause appears only in section 39-23.9(1) and is applicable only to claims brought under section 39-23.4(a)(1). Claims brought under section 39-23.4(a)(2) are not subject to a similar savings clause and instead must be brought in all instances within four years of the transfer sought to be avoided.

ECF No. 458 (15 CVS 1) ("There is no basis to impute any knowledge Lomax may have had to any other Plaintiff other than the entities for which he is an officer, and WWI does not suggest otherwise.")); *see also Reinninger v. Prestige Fabricators, Inc.*, 136 N.C. App. 255, 262, 523 S.E.2d 720, 725 (1999) ("[T]he principal is chargeable with the knowledge of his agent.").

26. Given that the Lomax and Roland Plaintiffs have pleaded facts showing that they discovered the 2010 Transfer "prior to" April 2011, the one-year savings clause in section 39-23.9(1) began to run no later than April 2011. The Court concludes that because the Lomax and Roland Plaintiffs did not file their claims under section 39-23.4(a)(1) or enter the Tolling Agreement prior to April 2012, these claims are untimely to the extent the Lomax and Roland Plaintiffs rest their timeliness argument on the one-year savings clause in section 39-23.9(1).[10]

27. The Court next turns to the Lomax and Roland Plaintiffs' contention that their NCUVTA claims are timely because the Tolling Agreement tolled the four-year statute of repose applicable to their claims under both sections 39-23.4(a)(1) and (a)(2). As noted above, the Tolling Agreement was entered between the Lomax and Roland Plaintiffs and Window World on April 23, 2013 and provided that "all time-based defenses, including without limitation any applicable statutes of limitations, *statutes of repose*, and the doctrine of laches with respect to the Covered Claims are hereby tolled effective April 23, 2013." (Tolling Agmt. ¶ 2 (emphasis added).)

---

[10] In light of the Court's conclusion, the Court need not consider whether the USPTO filings concerning the Transferred Assets also afforded the Lomax and Roland Plaintiffs notice of the 2010 Transfer for purposes of the one-year savings clause in section 39-23.9(1).

Plaintiffs seek to enforce the Tolling Agreement against WWI as an alter ego of Window World.

28. While it is undisputed that the Tolling Agreement was executed within four years after the 2010 Transfer, WWI contends that the Agreement did not effectively toll the statute of repose, arguing that (i) a period of repose cannot be tolled by agreement, (ii) "the doctrine of piercing the corporate veil does not and cannot operate to make an alter ego a party to a contract," and (iii) "equitable grounds cannot be used to avoid a statute of repose." (WWI's Br. Supp. Mot. J. Pleadings 13,[11] ECF No. 365 (15 CVS 1), ECF No. 385 (15 CVS 2).)

29. In contrast to statutes of limitations, which operate to limit the time a plaintiff has to file a claim, "statutes of repose function as more rigid stops." *KB Aircraft Acquisition, LLC*, 249 N.C. App. at 84, 790 S.E.2d at 566 (citing *Boudreau v. Baughman*, 322 N.C. 331, 340, 368 S.E.2d 849, 856 (1988)). Rather than running from the time a cause of action accrued, a statute of repose is generally measured from a "defendant's last act giving rise to the claim." *Id.* (quoting *Boudreau*, 322 N.C. at 340, 368 S.E.2d at 856). "A statute of repose creates an additional element of the claim itself which must be satisfied in order for the claim to be maintained." *Id.* at 85, 790 S.E.2d at 567 (quoting *Goodman v. Holmes & McLaurin Attorneys at Law*, 192 N.C. App. 467, 474, 665 S.E.2d 526, 531 (2008)). "If the action is not brought within the specified period, the plaintiff literally has no cause of action." *Id.* (quoting *Goodman*, 192 N.C. App. at 474, 665 S.E.2d at 531).

---

[11] For ease of reference, all pinpoint citations to the parties' briefs shall refer to filings in the Baton Rouge Action.

30. Although WWI argues to the contrary, North Carolina courts have explicitly recognized that a statute of repose may be tolled by agreement. *See Christie v. Hartley Constr., Inc.*, 367 N.C. 534, 540, 766 S.E.2d 283, 288 (2014); *Charlotte Motor Speedway, Inc. v. Tindall Corp.*, 195 N.C. App. 296, 302, 672 S.E.2d 691, 694 (2009) (holding contract containing tolling provision "operated to toll the statute of repose"). Indeed, our Supreme Court has found "no public policy reason why the beneficiary of a statute of repose cannot bargain away, or even waive" the advantages of claim extinguishment. *Christie*, 367 N.C. at 540, 766 S.E.2d at 287–88 ("[T]he beneficiaries of the statute of repose may choose to forgo that protection [afforded by the statutory period] without violating any rule of public policy."). Particularly in light of the "broad policy of the law which accords to contracting parties freedom to bind themselves as they see fit," *id.* at 540, 766 S.E.2d at 287, the Court concludes that the statute of repose set forth in section 39-23.9 may be tolled by agreement.

31. Turning then to the Tolling Agreement here, the Lomax and Roland Plaintiffs seek to enforce the Tolling Agreement against WWI as an alter ego of Window World under the equitable doctrine of piercing the corporate veil. WWI argues that dismissal is required because the Tolling Agreement cannot be enforced against WWI, which was not a party to the Agreement's terms.

32. Piercing the corporate veil "is not a theory of liability" but instead "provides an avenue to pursue legal claims against [those] who would otherwise be shielded by the corporate form." *Green v. Freeman*, 367 N.C. 136, 146, 749 S.E.2d 262, 271 (2013). "Disregarding the corporate form is not to be done lightly[,]" *id.* at 145, 749 S.E.2d at

270, but when the corporate form enables some fraudulent end, the responsible party should be estopped from achieving an unacceptable consequence, *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431, 439, 666 S.E.2d 107, 112–13 (2008).

33. In North Carolina, piercing the corporate veil is achieved through application of the instrumentality rule. *Estate of Hurst v. Moorehead I, LLC*, 228 N.C. App. 571, 577, 748 S.E.2d 568, 573 (2013). "[T]he instrumentality rule allows for the corporate form to be disregarded if 'the corporation is so operated that it is a mere instrumentality or *alter ego* of the sole or dominant shareholder and a shield for his activities in violation of the declared public policy or statute of the State[.]'" *Id.* at 577, 748 S.E.2d at 573–74 (quoting *Cooper*, 362 N.C. at 440–41, 666 S.E.2d at 113–14). If a corporate entity is determined to be an alter ego, it "will be disregarded and the corporation and the shareholder treated as one and the same person." *Id.* at 577, 748 S.E.2d at 574 (quoting *Cooper*, 362 N.C. at 441, 666 S.E.2d at 114).

34. Under the instrumentality rule, a plaintiff must prove the following elements before a court will pierce the corporate veil:

(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Glenn v. Wagner*, 313 N.C. 450, 455, 329 S.E.2d 326, 330 (1985).

35.     When considering whether to pierce a corporate veil, North Carolina courts examine the following factors: (i) whether the controlled entity is inadequately capitalized; (ii) the extent to which the controlled company has disregarded corporate formalities; (iii) complete domination of the controlled company by the controlling company; and (iv) excessive fragmentation of a single enterprise into separate corporations. *Glenn*, 313 N.C. at 445, 349 S.E.2d at 330–31.

36.     When the requisite elements and factors are present, courts will impose alter ego liability for a breach of contract. *See, e.g., S. Shores Realty Servs. v. Miller*, 796 S.E.2d 340, 353–54 (N.C. Ct. App. 2017) (concluding that plaintiff offered sufficient evidence to hold individual liable for LLC defendants' breach of contractual obligations and affirming trial court's denial of motions for directed verdict or JNOV); *Estate of Hurst*, 228 N.C. App. at 577–80, 748 S.E.2d at 574–75 (concluding alter ego liability was properly imposed against sole member of an LLC for LLC's breach of contract damages where member controlled LLC with respect to transactions that damaged plaintiffs); *Fischer Inv. Capital, Inc. v. Catawba Dev. Corp.*, 200 N.C. App. 644, 656, 689 S.E.2d 143, 150–51 (2009) (concluding trial court erred in dismissing reverse veil-piercing claim under Rule 12(b)(6) and stating "we are not persuaded that Plaintiff's claim amounts to an impermissible attempt to make [the corporate defendant] liable for [a note executed by an individual owner of the corporate defendant] despite the fact that [the corporate defendant] is not a party to that instrument"); *E. Mkt. St. Square, Inc. v. Tycorp Pizza IV, Inc.*, 175 N.C. App. 628,

640, 625 S.E.2d 191, 201 (2006) (concluding owner of corporate defendant was individually liable for the acts and obligations of the corporate defendant under a lease agreement); *Kerry Bodenhamer Farms, LLC v. Nature's Pearl Corp.*, 2018 NCBC LEXIS 84, at \*12 (N.C. Super. Ct. Aug. 15, 2018) ("[O]ur courts have pierced the veil in a case for breach of contract only where the evidence revealed other compelling factors apart from the breach itself."); *Insight Health Corp.*, 2018 NCBC LEXIS 56, at \*36–40; *see also Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) ("[T]raditional principles of state law allow a contract to be enforced by or against nonparties to the contract through . . . piercing the corporate veil [and] alter ego theories[.]" (internal quotation marks omitted)).

37.     Indeed, under the instrumentality rule, the alter ego "and the shareholder [are] *treated as one and the same person.*" *Estate of Hurst*, 228 N.C. App. at 577, 748 S.E.2d at 574 (emphasis added) (quoting *Cooper*, 362 N.C. at 441, 666 S.E.2d at 114).

38.     WWI relies heavily on *Cherry v. State Farm Mut. Auto. Ins. Co.*, 162 N.C. App. 535, 590 S.E.2d 925 (2004), for the proposition that "veil-piercing cannot 'rewrit[e]' a contract to substitute the alleged alter ego as a party." (WWI's Br. Supp. Mot. J. Pleadings 13–14.)  In that case, the plaintiffs in a wrongful death action arising out of a car accident sought a declaration that they were entitled to coverage under a commercial insurance policy issued by State Farm to B&L, a company owned and operated by the driver of the other vehicle, an individual named Jump. *Cherry*, 162 N.C. App. at 536, 590 S.E.2d at 927.  The plaintiff asked the court to pierce the veil between B&L and Jump for the purpose of reaching State Farm's insurance

coverage, arguing that Jump could be treated as the insured under the policy issued to B&L. *Id.* In refusing to "disregard B&L's separate corporate identity . . . for the purpose of reaching State Farm's coverage," the court stated that "[g]ranting plaintiffs' request would be tantamount to rewriting the terms of the subject policy by requiring State Farm . . . to cover someone other than the named insured." *Id.* at 539, 590 S.E.2d at 929.

39.    As the Court of Appeals subsequently explained,

> [h]ad the Court approved the "veil piercing" proposed in *Cherry*, the effect of that decision would have been to expand the liability of State Farm even though State Farm was not in any way involved in the conduct that allegedly supported the piercing of the corporate veil or in any alleged fraudulent transfer.

*Fischer Inv. Capital, Inc.*, 200 N.C. App. at 655, 689 S.E.2d at 150. Thus, *Cherry* does not stand for the proposition, as WWI suggests, that the doctrine of piercing the corporate veil cannot operate to subject an alter-ego party to a contract's terms. Rather, the decision merely posits that it would be improper to do so when the result would be to expand the liability of a third party uninvolved in the alleged transfer or abuse of the corporate form.

40.    Here, unlike the plaintiff in *Cherry*, the Lomax and Roland Plaintiffs are not seeking to gain the benefit of a contract by imposing liability on a third party who had no involvement in the conduct giving rise to their fraudulent transfer claims and veil-piercing remedy. To the contrary, Plaintiffs specifically allege that "WWI was created at Tammy Whitworth's direction because she and [Window World] anticipated litigation from Window World franchisees such as Plaintiffs over

[Window World's] unlawful business practices and wished to shield [Window World's] assets from such litigation." (Baton Rouge TAC ¶ 200; St. Louis TAC ¶ 299.) As such, Plaintiffs allege that WWI was involved in the fraudulent transfer at issue and in the conduct giving rise to the veil-piercing remedy sought.

41. WWI's other arguments against enforcement are equally unavailing. First, WWI argues that the Lomax and Roland Plaintiffs' failure to make WWI a party to the Tolling Agreement even though they were aware of the 2010 Transfer when they entered into the Agreement precludes enforcement. Our courts have held in similar circumstances, however, that such knowledge, standing alone, is insufficient to permit the Court to conclude as a matter of law under Rule 12(c) that enforcement is improper. *See Fischer Inv. Capital, Inc.*, 200 N.C. App. at 656, 689 S.E.2d at 151 ("[T]he fact that Plaintiff initially chose to do business with HCL and Defendant Mark Lewis rather than with [the alleged alter ego corporate entity] does not constitute such an insurmountable barrier to the maintenance of the present action as to require its dismissal pursuant to . . . Rule 12(b)(6)."); *see also E. Mkt. St. Square, Inc.*, 175 N.C. App. at 640, 625 S.E.2d at 200–01 (piercing corporate veil in breach of contract action even though contract was the product of "an arm's length transaction negotiated between two corporations and their respective attorneys"); *Insight Health Corp.*, 2018 NCBC LEXIS 56, at *36–40 (rejecting individual defendants' argument that plaintiff "should be denied veil-piercing relief because it chose to contract only" with one of the corporate defendants).

42. Moreover, that Plaintiffs do not allege wrongful conduct surrounding the execution of the Tolling Agreement is not dispositive. "'[D]omination sufficient to pierce the corporate veil need not be limited to the particular transaction attacked,' though it will rarely be the case that 'the domination does not extend to the transaction attacked.'" *Insight Health Corp. v. Marquis Diagnostic Imaging of N.C., LLC*, 2018 NCBC LEXIS 56, at *24 (N.C. Super. Ct. June 5, 2018) (quoting *Glenn*, 313 N.C. at 456, 329 S.E.2d at 331); *see State ex rel. Utils. Comm'n v. Nantahala Power & Light Co.*, 313 N.C. 614, 729, 332 S.E.2d 397, 464 (1985) ("[T]he separate corporate entity would be disregarded in those cases in which one affiliated corporation is shown to be without a separate and distinct corporate identity and is operated as a mere shell, created to perform a function for an affiliated corporation or its common shareholders without the necessity of proving that the control was also exercised over the particular transaction attacked." (internal quotation marks omitted)), *rev'd on other grounds*, *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953 (1986).

43. Plaintiffs here allege that Ms. Whitworth exerted complete domination over Window World and its affiliates and subsidiaries, including WWI. (Baton Rouge TAC ¶ 221; St. Louis TAC ¶ 320.) According to Plaintiffs, at the time of the 2010 Transfer, Window World "had no functioning board of directors, and its actions were directed solely and dominantly by [Ms.] Whitworth." (Baton Rouge TAC ¶ 202; St. Louis TAC ¶ 298). The Third Amended Complaints further allege that Ms. Whitworth, Window World, and WWI observed few corporate formalities, commingled funds, failed to

adequately capitalize the respective corporate entities, and maintained the same principal offices. (Baton Rouge TAC ¶¶ 205, 206, 211, 212, 213, 214, 288; St. Louis TAC ¶¶ 304, 305, 310, 311, 312, 313, 393.) Indeed, Plaintiffs allege that "WWI relied upon [Window World] to pay its bills" and that Window World "had control over all money in the coffers of WWI[.]" (Baton Rouge TAC ¶ 212(a); St. Louis TAC ¶ 311(a).) Accordingly, the Court concludes that Plaintiffs have pleaded sufficient facts that, taken as true, would support enforcement of the Tolling Agreement against WWI as the alter ego of Window World.

44. WWI also contends that the language in paragraphs 9 and 10 of the Tolling Agreement precludes enforcement. The Court disagrees. Although WWI argues that paragraph 9 "expressly provides that [the Tolling Agreement] is *only* the 'binding obligation of the Parties' to the agreement," (WWI's Br. Supp. Mot. J. Pleadings 12 (emphasis added)), that provision, titled "Full Capacity," merely provides that "[t]he persons executing this Agreement hereby represent and warrant that they have full authority and representative capacity to execute the Agreement in the capacities indicated below and that this Agreement constitutes the binding obligation of the Parties on whose behalf they signed." (Tolling Agmt. ¶ 9.) The Court does not read the last part of the clause—"the binding obligation of the Parties on whose behalf they signed"—as necessarily precluding Plaintiffs' veil-piercing remedy on the facts pleaded here.

45. Similarly, the full text of paragraph 10 undercuts WWI's argument. That provision, titled "No Third Party Beneficiaries," provides that "[a]ll undertakings,

agreements, representations and warranties contained in this Agreement are solely for the benefit of the Parties to this Agreement and there are no other parties who are intended to be benefited in any way by this Agreement." (Tolling Agmt. ¶ 10.) Because the Lomax and Roland Plaintiffs do not seek to make WWI a beneficiary of the Tolling Agreement, paragraph 10 has no application to the present dispute.

46. Accordingly, the Court concludes that the pleaded facts, viewed in the light most favorable to Plaintiffs, are sufficient to permit a conclusion that WWI may be bound to the Tolling Agreement. *See Ragsdale*, 286 N.C. at 137, 209 S.E.2d at 499 (noting that facts and inferences are to be viewed in the light most favorable to the nonmoving party and that "[w]hen the pleadings do not resolve all the factual issues, judgment on the pleadings is generally inappropriate"); *Fischer Inv. Capital, Inc.*, 200 N.C. App. at 652–53, 689 S.E.2d at 149 (reversing trial court's dismissal under Rule 12(b)(6) and concluding that the plaintiff "alleged sufficient facts to state a claim for relief as to whether [the defendant's] corporate veil should be pierced").

47. Notwithstanding the above, WWI argues that the combination of an equitable doctrine—piercing the corporate veil—and the Tolling Agreement cannot operate to toll the statute of repose as the Lomax and Roland Plaintiffs seek to do here. The Court disagrees.

48. Statutes of repose are not subject to equitable tolling doctrines. *See Christie*, 367 N.C. at 539, 766 S.E.2d at 287 ("While equitable doctrines may toll statutes of limitation, they do not toll substantive rights created by statutes of repose." (quoting *Monson v. Paramount Homes, Inc.*, 133 N.C. App. 235, 240, 515 S.E.2d 445, 449

(1999)); *KB Aircraft Acquisition, LLC*, 249 N.C. App. at 87, 790 S.E.2d at 568 ("We hold that Section 39-23.9 is a statute of repose and includes no language creating an exception for equitable doctrines, thereby precluding equitable remedies such as equitable tolling[.]").

49. Piercing the corporate veil is an equitable doctrine. *Cooper*, 362 N.C. at 440, 666 S.E.2d at 113; *Glenn*, 313 N.C. at 458, 329 S.E.2d at 332 ("[T]he theory of liability under the instrumentality rule is an equitable doctrine."); *see Insight Health Corp.*, 2018 NCBC LEXIS 56, at *26–32. As discussed above, however, our appellate courts have explicitly recognized that statutes of repose may be tolled by agreement. *See Christie*, 367 N.C. at 540, 766 S.E.2d at 287–88; *Charlotte Motor Speedway, Inc.*, 195 N.C. App. at 302, 672 S.E.2d at 695.

50. Here, the Lomax and Roland Plaintiffs do not invoke the instrumentality rule to toll the statute of repose set forth in section 39-23.9 as a matter of equity. Rather, they allege that the Tolling Agreement operated to toll the statute of repose against Window World and its alter ego, WWI, as a matter of contract right. Thus, those cases holding that equitable doctrines cannot toll statutes of repose have no application on the facts pleaded here.

51. Accordingly, the Court concludes that the Lomax and Roland Plaintiffs have pleaded sufficient facts to permit a reasonable factfinder to conclude that the Tolling Agreement tolled the four-year statute of repose in sections 39-23.9(1) and (2) on their claims under sections 39-23.4(a)(1) and (a)(2) of the NCUVTA. As a result, the Court concludes that WWI's Motion should be denied as it relates to these claims.

B.    The Remaining Plaintiffs

52.    The Court turns first to the four-year statute of repose in 39-23.9(1) and (2) and its application to the Remaining Plaintiffs' claims. It is undisputed that the Remaining Plaintiffs' claims were filed more than four years after the 2010 Transfer. It is also undisputed that the Remaining Plaintiffs were not parties to the Tolling Agreement. As such, the Court concludes that the Remaining Plaintiffs' claims under section 39-23.4(a)(2) are untimely as a matter of law and should be dismissed.[12]

53.    WWI also contends that the Remaining Plaintiffs' claims under section 39-23.4(a)(1) are untimely to the extent they rely on the one-year savings clause in section 39-23.9(1). In contrast to their allegations concerning the Lomax and Roland Plaintiffs, Plaintiffs omit any allegation in the Third Amended Complaint that the Remaining Plaintiffs discovered the 2010 Transfer prior to April 2011 or were otherwise made aware of the 2010 Transfer prior to initiating these Actions. Nevertheless, WWI argues that the Remaining Plaintiffs reasonably could have discovered the 2010 Transfer prior to January 2, 2014 (i.e., one year before these Actions were filed) based on WWI's registration of ownership concerning the Transferred Assets with the USPTO in 2010. (WWI's Br. Supp. Mot. J. Pleadings 8–10.)

54.    Claims under section 39-23.4(a)(1) that rely on section 39-23.9(1)'s one-year savings clause are extinguished unless action is brought "not later than one year after the transfer or obligation was or could reasonably have been discovered by the

---

[12]  The Remaining Plaintiffs appear to concede that dismissal of their claims under section 39-23.4(a)(2) as untimely is appropriate. (*See* Pls.' Br. Opp'n Mot. J. Pleadings 9 (15 CVS 1).)

claimant[.]" N.C. Gen. Stat. § 39-23.9(2). WWI does not cite, and the Court's own research has not disclosed, any case, in North Carolina or otherwise, in which a court has concluded that registration of ownership with the USPTO is sufficient to put a creditor on notice under the Uniform Voidable Transactions Act (the "UVTA"). WWI contends generally, however, that the disclosure of a transfer on the public record—here, the USPTO register—establishes, as a matter of law, that the transfer could reasonably have been discovered by a creditor for purposes of the one-year savings clause.

55. Courts considering whether a public filing "could have been discovered" as a matter of law under the UVTA have reached conflicting results. *Compare Menotte v. Gassan (In re Tabor)*, Nos. 14-20731-EPK, 15-01577-EPK, 2016 Bankr. LEXIS 2315, at *12 (Bankr. S.D. Fla. June 17, 2016) ("This Court agrees with those courts ruling that recording, alone, does not as a matter of law establish that a creditor could reasonably discover a fraudulent transfer."), *Desak v. Vanlandingham*, 98 So.3d 710, 713 (Fla. Dist. Ct. App. 2012) ("We now hold that the act of recording a deed does not without more, as a matter of law, start the 'savings clause year.'"), *Bueneman v. Zykan*, 181 S.W.3d 105, 111 (Mo. Ct. App. 2005) ("We don't believe that [a]ppellants reasonably could be expected to search the recorder of deeds before they even obtained a judgment against Zykan, or before they realized their judgment was not going to be paid by Zykan."), *Gulf Ins. Co. v. Clark*, 20 P.3d 780, 788 (Mont. 2001) ("The act of recording a transfer of real property in and of itself does not absolutely establish that a creditor has acquired actual or constructive knowledge of a transfer. Rather, we

conclude that the 'reasonable discovery' of the transfer is a discretionary ruling, one that must be adjudicated on a case-by-case basis."), *SASCO 1997 NI, LLC v. Zudkewich*, 767 A.2d 469, 476 (N.J. 2001) (concluding that savings clause ran from time a reasonable commercial creditor would have done an asset search and not from when deed was recorded), *superseded by statute*, N.J. Stat. Ann. § 25:2-31(a), *Supreme Bakery, Inc. v. Bagley*, 742 A.2d 1202, 1204–05 (R.I. 2000) ("[T]he mere filing of the deed alone may not have been enough to alert [the plaintiff-creditor] to the transfer[.]"), *and Johnston v. Crook*, 93 S.W.3d 263, 271 (Tex. App. 2002) ("Registration of a fraudulent conveyance at a certain date, however, is merely one circumstance bearing on the creditor's actual or presumed knowledge."), *with Epperson v. Entm't Express, Inc.*, 338 F. Supp. 2d 328, 344 (D. Conn. 2004) (concluding savings clause was triggered when UCC-1 statements were filed as public records), *and Montoya v. Tobey (In re Ewbank)*, 359 B.R. 807, 810 (Bankr. D.N.M. 2007) ("Upon recordation, the deeds became part of the public record, and, therefore, could reasonably have been discovered by searching the Bernalillo county real property records.").

56. In *KB Aircraft*, the most relevant North Carolina case the Court's research has discovered, the Court of Appeals eschewed a per se rule of the sort followed in *Epperson* and *Montoya* above. In that case, the plaintiff asserted a fraudulent transfer claim based on a transfer of real property from the individual defendant to the corporate defendant after the individual defendant defaulted on a contractual obligation. *KB Aircraft Acquisition, LLC*, 249 N.C. App. at 78, 790 S.E.2d at 563.

While the transfer was recorded in the public record and could have been discovered through a title search, the court focused on the circumstances which put the plaintiff on notice in assessing whether the fraudulent transfer "could reasonably" have been discovered:

> [A] plaintiff has a duty to exercise reasonable diligence to discover the fraud or misrepresentations that give rise to [its] claim. [W]hen an event occurs to excite the aggrieved party's suspicion or put [it] on such inquiry as should have led, in the exercise of due diligence, to a discovery of the fraud, that party is deemed to have inquiry notice of the same.

*Id.* at 89, 790 S.E.2d at 569–70 (internal citations and quotation marks omitted).[13]

57. In light of *KB Aircraft* and the greater weight of the relevant authority, the Court cannot conclude, as WWI contends, that recording ownership in public records, standing alone, establishes as a matter of law that a creditor could reasonably discover a fraudulent transfer under section 39-23.9(1). That our courts have frequently recognized that "[r]easonableness is a quintessential jury question," *Dysart v. Cummings*, 181 N.C. App. 641, 653, 640 S.E.2d 832, 840 (2007), further supports the Court's conclusion, *see also Piles v. Allstate Ins. Co.*, 187 N.C. App. 399, 405, 653 S.E.2d 181, 186 (2007) ("The date of [the plaintiff's] discovery of the alleged fraud or negligence - or whether she should have discovered it earlier through reasonable diligence - is a question of fact for a jury[.]").[14]

---

[13] On the facts of that case, after noting that the individual defendant's "personal financial statements [were] enough to cause a reasonable person with an interest in the Property to inquire further into its present status," the court held that the plaintiff's claim was untimely under the one-year savings clause. *KB Aircraft Acquisition, LLC*, 249 N.C. App. 89–90, 790 S.E.2d at 570.

[14] Additional support may also be found in pre-NCUVTA case law. *See Cowart v. Whitley*, 39 N.C. App. 662, 664, 251 S.E.2d 627, 629 (1979) (analyzing claim under former fraudulent

58. In support of its argument that filing with the USPTO affords "notice to all" and makes any section 39-23.4(a)(1) claim filed more than one year thereafter untimely, WWI relies heavily on federal decisions, all of which involve a party claiming an ownership interest in or a violation of its own intellectual property rights. *See Sontag Chain Stores Co. v. Nat'l Nut Co. of Cal.*, 310 U.S. 281, 295 (1940) (noting that recording a patent with the USPTO amounts to constructive notice in a patent infringement action); *Rebel Debutante LLC v. Forsythe Cosmetic Grp., Ltd.*, 799 F. Supp. 2d 558, 575 (M.D.N.C. 2011); *Motha v. Time Warner Cable, Inc.*, No. 16-cv-03585-HSG, 2016 U.S. Dist. LEXIS 166893, at *7 (N.D. Cal. Dec. 2, 2016) (holding statute of limitations on conversion claim began to run when allegedly fraudulent assignment of plaintiff's intellectual property rights was recorded with USPTO); *see also* 15 U.S.C. § 1072 ("Registration of a mark on the principal register . . . shall be constructive notice of the registrant's claim of ownership thereof.").

59. On the facts pleaded here, however, none of the Plaintiffs claim to hold an ownership interest in the Transferred Assets, and each has less incentive to discover a transfer through public records searches than the interest-owning plaintiffs in the cases on which WWI relies. As a result, the Court is not persuaded that a third-party creditor who does not claim ownership of, or an interest in, transferred assets, like the Plaintiffs here, should be held to the same demanding standard as interest

transfer statute and concluding "the mere registration of the deed to the defendant corporation cannot be said to be sufficient to start the running of the statute of limitations on plaintiff's claim"); *see also FDIC v. Mingo Tribal Pres. Tr.*, No. 5:13-CV-113, 2015 U.S. Dist. LEXIS 49777, at *17 (W.D.N.C. Apr. 14, 2015) (relying on *Cowart* to deny dismissal of NCUVTA claim arising out of a conveyance of property which served as guaranty on a loan).

owners. *See, e.g.*, *KB Aircraft Acquisition, LLC*, 249 N.C. App. at 89, 790 S.E.2d at 570 (noting that discrepancies in the defendant's financial statements were "enough to cause a reasonable person with *an interest in the Property* to inquire further into its present status" (emphasis added)); *see also, e.g.*, *Desak*, 98 So.3d at 714 (distinguishing "between subsequent purchasers and creditors alleging fraudulent transfers" and concluding that "[i]t is not reasonable to require a defrauded creditor to monitor the land records in all 67 counties or, indeed, outside the state, as well, as a routine practice"). As such, the Court concludes that WWI's 2010 USPTO filings are not sufficient, standing alone, to put the Remaining Plaintiffs on notice of the 2010 Transfer.

60. Consequently, the Court cannot conclude on the pleaded facts that the 2010 Transfer could reasonably have been discovered by the Remaining Plaintiffs as a matter of law. *See Menotte*, 2016 Bankr. LEXIS 2315, at \*12 ("The determination of when a particular triggering creditor could reasonably have discovered a fraudulent transfer is a factual issue that may require consideration of various evidence in addition to the recorded Transfer. It is not appropriate for the Court to determine this issue at the motion to dismiss stage."). Therefore, WWI's Motion shall be denied to the extent WWI seeks dismissal of the Remaining Plaintiffs' fraudulent transfer claims under section 39-23.4(a)(1). *See Ragsdale*, 286 N.C. at 137, 209 S.E.2d at 499 ("When the pleadings do not resolve all the factual issues, judgment on the pleadings is generally inappropriate.").[15]

---

[15] WWI vaguely suggests in a footnote to its reply brief in the St. Louis Action that Plaintiffs' licensing agreements with WWI put Plaintiffs on notice of the 2010 Transfer. (WWI's Reply

IV.

CONCLUSION

61.   **WHEREFORE**, the Court, for the foregoing reasons, hereby **ORDERS** as follows:

    a. Defendant Window World International, LLC's Motion for Judgment on the Pleadings is hereby **DENIED** to the extent it seeks judgment as to the Lomax and Roland Plaintiffs' claims under N.C. Gen. Stat. § 39-23.4(a)(1) and (a)(2); and

    b. Defendant Window World International, LLC's Motion for Judgment on the Pleadings is hereby **DENIED** to the extent it seeks judgment as to the Remaining Plaintiffs' claims under N.C. Gen. Stat. § 39-23.4(a)(1) and **GRANTED** to the extent it seeks judgment as to the Remaining Plaintiffs' claims under N.C. Gen. Stat. § 39-23.4(a)(2). The Remaining Plaintiffs' claims under N.C. Gen. Stat. § 39-23.4(a)(2) are hereby dismissed with prejudice.

    **SO ORDERED**, this the 11th day of February, 2019.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Chief Business Court Judge

---

Br. Supp. Mot. J. Pleadings 6 n.5 (15 CVS 2).) None of these agreements, however, were attached as exhibits to the pleadings or otherwise filed in connection with the Motion. The Court, therefore, does not consider any such agreements on this Motion and concludes that WWI has failed to carry its burden on this argument. *See Ragsdale*, 286 N.C. at 137, 209 S.E.2d at 499 (stating that a Rule 12(c) movant "is held to a strict standard and must show that no material issue of facts exists and that he is clearly entitled to judgment").